Good morning, Your Honors. My name is Jennifer Wilson. I represent the appellant, Renita Blunt, and I have reserved two minutes for rebuttal. In this direct appeal, Ms. Blunt has argued that she was wrongfully convicted and sentenced, and she's raised five issues attacking her conviction and sentence. I'm mindful of the begin by focusing on the duress issue, and then, of course, if time permits, turn to the sovereigns issue. To begin, Ms. Blunt raised a defense of duress, which would have been a defense, or is a defense, to all of the counts with which she was charged. How immediate was, given her testimony, how immediate was what she said was the threat that she's relying upon? Well, her testimony, which is at pages 793 and 794 of the record, is that she perceived that there was an immediate threat. That perception, however, would have to be a reasonable perception, right? Certainly. Objectively reasonable. Certainly. But her testimony, which was uncontradicted by the government, was that she perceived a threat, she believed it to be real, and that she acted upon it. Who was the threat from? Because there seems to be some ambiguity in her testimony as to who might represent that threat. And that may be important, or at least relevant, to the immediacy aspect here, too. That's right, Your Honor. And actually, if I may refer specifically, because it's a very brief portion of her testimony, but very important, and I don't want to misstate her testimony. So if I may grab those pages. Give us the page number for that. It's pages 793 and 794 in the appellate record. And I understand the discrepancy, or I don't know if it's a discrepancy, but I understand the two different statements that the Court is likely referring to. Initially, her statement on page 793 of the record was in answer to the question of essentially what was the threat. What volume is it in? The appendix is in numerous volumes. This is in, I believe, volume 4. Appendix 4? Number 4. Okay. So at lines 4 and 5 on page 793, she stated, again, this is in answer to the question of what was Mr. Hall saying to you. And her testimony was that there was going to be problems, and then he told me if I didn't make this call, that he was going to kill us. The he becomes kind of the crucial word, because several lines down, line 19 to 20, again, she's asked, what were you told? That people was going to bring harm to our family. They was going to pretty much kill us. But in that sense, the he becomes a very unspecific pronoun. That's obviously, I think, the concern, at least from my perspective, the reason for some concern. And she indicates that in response to the question is what she thought that meant was the whole household. Right. Right. She's asked next, you or him, and her answer is us. And then she's asked to clarify essentially what did you think that meant? The whole household is her answer. What is clear from her testimony, and what didn't change at any point, was that the speaker, the person who conveyed, we'll call it the information, to her about a threat was her husband, Earl Hall. What I'm interested in hearing from you are two points. One is if you agree with me that this, under our own case law in the Third Circuit, is a high hurdle for your client. At least with respect to the immediacy aspect of the test. We've said in one case, in Alston, only in rare circumstances will anything but an immediate emergency constitute a present threat. That's a high hurdle, isn't it? And if it is, or even if you do not agree with my characterization, what is it about this case that allows you to meet that test? Well, that's multiple questions, Chief Judge Smith, and I'll do my best to. That's two. Okay. Well, let me start with whether or not it's a high hurdle. I don't think there's any disagreement between counsel for the government or counsel for Ms. Buck. Whether it's high or intermediate, our opinion that I just read says what it says. Only in rare circumstances. That's right. So what is it about the facts of your case that allow you to meet that test? Okay. Well, first of all, sort of the heightened level of scrutiny, if you will, that seems to be applied in some cases to the defense of duress, seems to take place most frequently in felon and possession cases. So the Alston case and so many other cases, this defense is raised in felon and possession cases. I carried the gun because somebody threatened me and, yeah. And this court and others have held defendants in that specific factual circumstance to a very high standard. The immediacy needs to be very short, right? So, and I don't recall whether it's the Alston case or perhaps one of the other felon and possession cases that I reviewed for this argument, but to the extent that an individual who is not permitted to possess a firearm feels that they are threatened, there has to be a momentary, there needs to not be a significant lapse in time. I would agree that there's nothing in our cases that somehow suggests that a different test is applied in the felon and possession cases as opposed to a case like this. It's just that they happen to preponderate in our case law among those cases that are immediate emergency present threat cases. I would agree. I would agree. And so with respect to my client, I think it's a very fact-intensive inquiry. And so her testimony was she's in her home. Her husband has told her that there is a threat either to him or to their whole household by someone that they will be harmed or possibly killed if she will not help him by making this call. So it's a subjective state of mind at that point. Well. Just thinking. Right, right. So she has to reasonably believe that there is a threat that directly then causes her to take the criminal action. And she has to, the standard is there has to be no reasonable opportunity to avoid the harm without committing the criminal act. There's also testimony of support that she suffered a chipped tooth and that the husband was very agitated and angry, right? Well, this actually relates to the severance issue. So pretrial, the indication was in the pretrial motion for severance that that would be her testimony. That testimony was not provided. Didn't turn out to be the testimony at trial. She did not testify to that when her husband was sitting directly in front of her while she was testifying, correct? And with respect to the severance argument, she's also prevented from testifying about reporting this to a special agent, right? The judge kind of tightened that up and said she could testify that she reported it to somebody but not to a special agent. Correct. So her testimony was compromised in that perspective, right? Correct. And in the pretrial motion that you filed, you took the position that she shouldn't be forced to choose between her marital privilege and her right to testify, correct? Correct. And there's authority in the Third Circuit supporting that? Correct. Why don't you elaborate on that? Sure. U.S. v. Amar. Now, admittedly, DICTA talks about the fact that a spouse should not be required to choose between exculpating herself and inculpating her spouse. Let's go to that proceeding itself, or perhaps more accurately, that stage of the proceedings. Am I correct that the severance motions pretrial were decided entirely in the papers? Yes. There was no hearing, no oral argument? Correct. They were decided approximately a week before the – no, less than a week before the trial began. We are required to look at the condition of the record as it existed at the time of the motion, right? Not what was testified to later on. Well, Your Honor, my client argues that she was prejudiced by the lack of severance. So, I mean, I think you do need to look at that. Well, I understand, but you can't expect the district court to make a decision in a vacuum either. She has to deal with what's been presented to her. But it may also be that the district court here should have required more. Perhaps the district court should have asked – should have called for oral argument. Because this is – it is a complicated and even somewhat conjectural matter to try to determine how this is going to play out in a courtroom. But that's exactly what the district court's job is. And do you think that from the papers suggesting the marital relationship and the dilemma that was presented to your client, that that should have been some kind of a signal to the district court that the district court really needed to probe more here? Well, absolutely, Your Honor. We would welcome the opportunity to have an opportunity to elaborate on the papers with the district court and to answer the court's questions. But fundamentally, what my client represented through counsel in her pretrial pleading was that she was married to her co-defendant, that she wanted to testify and exculpate herself and provided some specifics of what her testimony would be. Well, that's what I was going to ask. Was there a proffer? Through the papers only, because there was no hearing. So it's only what is in the pretrial motion. How close to those papers, the proffer in the papers, was that to the testimony? What I'm trying to get at is how much information the district court had at the time the papers were looked at. Right. Well, the statement of, well, fundamentally, Ms. Blunt said she would like to testify on her own behalf and that she would like to testify to exculpatory matters, including her own lack of knowledge, essentially lack of mens rea, and the duress issue, her defense of duress. The papers? Yes. I'm looking at your motion to sever, right? Right. Maybe in the brief. So I can check on that between here and when I come back for rebuttal. It may be that it's in the brief in support. It would be helpful to know that. Yes. But at a minimum, the judge was told, my client, who's married to the co-defendant, wants to testify. If she testifies, she's going to inculpate her husband. Yes. Yes. And that was the fundamental dilemma presented to my client, right, the desire to exculpate herself through her own testimony, but that her own testimony, exculpating herself, would simultaneously inculpate her husband, who in- Kind of the reverse of fields, where her misdreavor was found to result from that erroneous denial of a severance, because the testimony that was given basically was exculpatory to everybody. But that wasn't, as I recall, directly against the defendant. That was a co-defendant. But the end result was the same. Right. And this is also similar to the Dobson case, which is an Eastern District of Pennsylvania case. It's cited in the briefs discussed. Well, let's stick, I mean, that's an Eastern District case. And with all respect, I mean, we're looking, must look to our own jurisprudence, and more importantly, to what the Supreme Court has said. And Zafiro has got to be our at least starting point, if not guiding light here, right? Right. Absolutely. And so under Zafiro, you have to be contending that what we have here, what the District Court had before her, were mutually antagonistic defenses, right? Right. So how were they mutually antagonistic? Well, my client maintained that the one and only action that she took in this case, which was placing a phone call, was at the direction and under threat from her co-defendant. I think that is the antagonism between the two. In addition, what emerged at trial was that she felt it was exculpatory for the jury to know that she had reported what she perceived to be suspicious conduct by her then boyfriend, now husband, to law enforcement in two instances. Well, but in addition to the defenses being mutually antagonistic, she has to demonstrate that she suffered clear and substantial prejudice, right? So what was the clear and substantial prejudice here? So based on the testimony, she, of course, did testify. She did testify to exculpatory matters. The prejudice that we have asserted. She did testify, and had there been severance, that wouldn't have been the case, right? I mean, to her advantage here, she could decide at her own trial whether or not she wanted to testify. Here, she found herself on the horns of a dilemma and determined that it was best for her to testify. Absolutely. Absolutely. To what extent would the marital privilege play into that? I think where it plays in is if the trials had been severed, if Mr. Hall had proceeded to trial, she could not have been compelled to testify against him. So I see that my time has expired. I do have two minutes on rebuttal. Okay. We'll have you back on rebuttal. Thank you very much. Daniel. Good morning, Your Honor. Pleased to court. My name is Kim Daniel. I'm an assistant United States attorney, and I represent the government in these appeals. Can we start with the duress issue and then move to the severance issue? Certainly, Your Honor. Judge Rambo, in this case, Your Honor, I think reached the appropriate and only conclusion with respect to the applicability of this affirmative defense duress. There are four clear elements. It's an affirmative defense. The case law from the circuits indicates that the defendant bears the burden of proving his entitlement to this defense. Judge Rambo listened very carefully to the arguments of counsel. After she heard Renita Blunt's testimony, she immediately went into the charge conference, but she concluded, number one, as I believe this court had some questions, that there was no immediate threat of death or serious bodily injury here represented by the testimony of Renita Blunt. As the Olson case makes it very clear, this must be an immediate emergency, and that certainly wasn't the situation. We were talking about a husband and wife alone in their home in Illinois, talking about what might happen to them by third parties if they didn't make this phone call. Wait a minute. Were they a husband and wife then? Not at that time, no, Your Honor. They were not. He became husband and wife later. Later on in 2016. This was in 2014 when this particular phone call took place. But they had been cohabitating together, and they did have children. Judge Rambo not only found that there was no immediate threat of death, she also found that there was a second requirement missing, and that was there was no reasonable legal alternative to engaging in this criminal misconduct. She noted that Ms. Blunt testified that this first request from Mr. Hall to make this phone call took place two or three days before the actual date that the call was made. He repeated his request, and finally on June 25th, that's when he started telling her about this threat from the undescribed third parties. Judge Rambo concluded that Ms. Blunt had other alternatives. She could have left the home. She could have called the police. She could have done a variety of other things to avoid making this criminal phone call. And I think the third requirement that the Alston Court has spelled out is that this fear must be well-grounded. This wasn't a well-grounded fear. It was her husband telling her something about somebody undescribed who might harm them, kill in fact the entire family, two adults and five children, over the failure to make a phone call inquiry regarding an unemployed compensation benefit claim. She just didn't meet the criteria. Whether or not that was a well-grounded fear, in the safety of our offices we can always say it's not reasonable to assume that somebody who says that someone is going to wipe out the entire household if you don't make that call seems like an off-the-wall kind of assumption. But unfortunately, in the real world, I'm not so sure that those kinds of things, those kinds of threats don't sometimes get carried out. Certainly, Your Honor, I think there's a subjective component to this. But all in all, I think the court also has a duty to look at this from a reasonable, objective viewpoint in deciding whether or not this very rare affirmative defense, whether the jury should be charged in this instruction. And Judge Rambo did, of course, strike a compromise of sorts. She did allow counsel to make this argument to the jury. And then she gave a curative instruction. Indeed. And I think it was relevant and germane to the court's instructions with respect to the intent requirement of the mail fraud and money laundering charges. In any event, Your Honor, we must look to the time that Judge Rambo had when she made this decision. And this court has to determine that this was a clear abuse of discretion, that this was totally unreasonable for Judge Rambo to do. And I think under these circumstances, based on her careful listening to that testimony, she made the right decision. So on both issues we want to hear from you on are subject to the abuse of discretion standard of review. That's true. And if I could turn to the severance question, Your Honor. As the court has noted, again, the question here is whether the court properly applied the case law, the guidance, not just from this circuit, but from the Supreme Court and Sofero. Dobson and Ali, the two cases cited by the defense in support of their position, cases that decided a severance question in the specific context of a conflict between the right to testify and the privilege of the marital privilege. That's the scenario we have, right? I mean, you had the wife in this case confronted with a decision. Am I going to testify and present evidence that I know is going to be inculpatory to my husband or not? Yes. So she's forced to choose between one or the other, right? It is. And the judge knew that. And the judge knew that. Why should she have to choose? Because. Why should she be put in that position? Because it is the difference between a right, a fundamental right, and a privilege. And what this circuit's case law and Sofero has instructed is that the court must look at the following factors. The likelihood of the defendant testifying. She affirmatively represented she was going to testify. Yes, she did. And she, in fact, testified. Well, what specifically would happen, a week before trial, there was a motion filed for severance. It was titled a joint motion for severance. It was prepared by counsel for Ms. Blunt, but it was represented that Mr. Hall also joined in it. In that motion and subsequent supporting brief, there was a written proffer put forth that detailed exactly what Ms. Blunt was about to say. Four days later, a second motion was filed for severance, this one by Mr. Hall. In that motion, it sort of contradicted the earlier motion. Counsel for Mr. Hall said it was unclear whether or not Ms. Blunt was going to testify. How in the world would he know? Was she supposed to tell him what she'd say? If she got on the witness stand? They were living together, Your Honor, and they were married. And they're both charged with felonies. In some of the cases, and I can't remember which one it is now, maybe, Austin, but the district court gets into this incredible mind-boggling inquiry about what the defendant could possibly say if the defendant gets on the witness stand. Well, the defendant has to say this. And why would a district court ever put him or herself in that position of forecasting what a defendant would say on the witness stand? The defendant could, depending on how things unfold in the trial, decide, well, I'm not getting on the stand after all. I'm not going to testify. Well, Your Honor, I think you hit the nail right on the head. And I think what happened here was the government, in filing its response to that joint motion where we had that detailed proffer, we presumed that that's the way it was going to be. And we responded to the court by focusing on these factors that came out from this circuit's trilogy of opinions in 2005, the Lohr, Urban, and Davis decisions, which we cited in our brief. And they mirror what the Supreme Court said in Zafiro. And what you've got to look at, what the court has to look at, is whether or not a real fundamental right is being infringed upon here in this conflict situation, the right to testify. And what you look at is whether the proffer testimony of the spouse is, in fact, providing exculpatory testimony. And when you look at exactly at the proffer, where Ms. Blunt was going to say, I'm going to admit I made a phone call to the Pennsylvania Department of Labor and I'm going to admit I impersonated another individual and I gave them false information in pursuit and in the furtherance of a false claim for benefits, the court rightfully concluded that's not exculpatory testimony. So this only applies if you're going to offer inculpatory testimony? No, it has to be exculpatory. Excuse me, it has to be exculpatory. It has to be exculpatory or else there really isn't any right that's being infringed upon. Well, the right not to incriminate your spouse, the privilege not to incriminate your spouse. In fact, that's a distinction that you maintain is important here and that you're making. Exactly. The difference between a fundamental right and a privilege. And that's the distinction that this middle district made in the Ferrer case in 2008 after our trilogy came and the distinction that the western district made in Manfredi. It is, and also a district court in Missouri. The more recent decisions have all been drawing a distinction between the fundamental right of testimony versus a privilege. What has the Supreme Court said? And is it fair to you anywhere else that a district court can put a defendant in a position where in order to allow a defendant to exercise a right,  The question is whether or not the party is suffering prejudice to a right. Right. That's your question. But answer my question. Why do you have to surrender that spousal privilege? Well, number one, it's not absolute contrary to what's argued here. The privilege rests with the testifying spouse. So this argument that, you know, had there been a severance, Miss Blunt couldn't have testified against Mr. Hall, that's not necessarily true. She can still testify if she wants. Well, the damaging stuff here, we'll get to that when we get to his argument, but the damaging testimony may not have come out. Yeah. Well, our argument there, Your Honors, is simply that her testimony was not damaging to Mr. Hall. And in fact, it was. Saying that he. Suggested. He may blow away by a family? I think overall, Your Honor, when you look at the overall context of her testimony, her 90 pages of testimony, it dovetailed with Mr. Hall's defense. Well, surely you concede that there is at least a whiff of domestic abuse here, of a threat of domestic abuse. I mean. Well, Your Honor, there was a proffer about a chip. The transcript says what it says. And in fact, Defendant Blunt's motion and brief upon which the district court made its decision, laid out the prospect of some testimony of a threat of violence. Wouldn't you concede that? Absolutely. At the very least. Absolutely. But, Your Honor, my point we're trying to make here is that Blunt's testimony that incriminated Mr. Hall really was redundant. The government had already introduced. That makes it worse. No, Your Honor. My argument is that there was no real prejudice suffered by Mr. Hall as a result, because the government already introduced proof showing that Mr. Hall was all part of that phone call. Edgar Leon had already identified his voice in that phone call. The government already established Mr. Hall's participation in it. Mrs. Blunt's testimony, her stipulation, didn't really add anything. The government already established that. Did the government introduce evidence that he or someone perhaps under his control or influence had threatened to kill her and her family? Well, I don't think it was that clear that it was Mr. Hall's threat. I said he or someone under his influence or control had threatened to kill her and her family. Did the government introduce that evidence? Did the government introduce it? No. And how is that helpful? I'm curious. How is that helpful? Because it got his defense to the jury. The defense that he presented through counsel in closing argument was that this wasn't me. This was somebody else. These checks that were mailed to Illinois for which I was convicted of mail fraud were mailed to a Stephanie Hillens in Sarver, Pennsylvania. And somebody else assumed my identity and perpetrated this crime. And that's consistent with this premise about some unknown third party out there. That's when the judge gave the standard charge that nothing that the defense counsel or nothing the prosecutor say is evidence. The evidence comes from the witnesses or the witness stand. So how would the closing argument put evidence into the case if the jury followed its instruction? There was testimony about that, Your Honor. There was testimony that the defendant or someone under his influence or control threatened, the defendant, Mr. Hall, threatened to kill Ms. Blunt? No, that only came from Ms. Blunt. In fact, the closing argument of defense counsel was pretty brief and targeted toward that area that you just referred to. So I'm taking what you're saying as being that this testimony actually, you say it helped, whether it did or didn't. It really directed defense counsel in a specific way toward a specific defense strategy or at least tactic, which he then took up in closing argument. Your Honor, I think the proof of the pudding here as to whether or not Ms. Blunt's testimony was really hurtful, prejudicial, Mr. Hall, and I don't believe these were intestinal defenses. She testified for some 90 pages, I don't know, two hours or more. When the first person that had an opportunity to cross Ms. Blunt about her testimony was Mr. Hall, his counsel. Two questions, and that was it from counsel for Mr. Hall. Isn't it true, Ms. Blunt, that you and Mr. Hall went on a trip to Colorado a couple years ago? Yes. Isn't it true that Mr. Hall told you that somebody had taken his bank card and accessed his bank card? Yes. Thank you very much. No further questions. Again, her testimony was supporting his defense that this was a third party, unknown third party, that had forced, that actually committed the crime and got them involved in it somehow. And the rest of her testimony about Mr. Hall was actually fairly favorable. Hard-working man, lives with us. He has two children with me, five kids all together, one with serious medical issues. What about the magic jack? Was that helpful? She testified that she never saw him or never overheard him talking about a false claim, and to her knowledge, he had no involvement in any fraudulent activity until June 25, 2014, on that Shonta Williams call. That was her testimony. She said she had no other idea. She did report on one occasion what she thought was a suspicious debit card to her probation officer, and then Judge Rambo also allowed her to say that she reported it to a second person. But that wasn't specifically geared to this false claim, the unemployment benefits claim. She described it as a debit card laying on a table. The bottom line in all of this is even if you determine that Judge Rambo abused her discretion, the defense still has to show a demonstration of clear and substantial prejudice resolving in a manifestly unfair trial. How do you score that with the field's opinion? With the field's opinion regarding grand jury testimony and the spousal privilege, is there language in there about prejudice? Your Honor, I have to confess I'm not familiar with that opinion. There's some dicta in there suggesting that prejudice is not to be considered. Different context. It's the grand jury. I'm not familiar with that particular decision. I am familiar with the Amar decision where I think Judge Rambo determined, and others determined, that that dicta was misinterpreted in there with respect to a marital communications privilege versus the spousal privilege, which is applicable here. But in any event, the bottom line, even if you conclude that Judge Rambo abused her discretion in keeping these trials together, there must be an affirmative demonstration of clear and substantial prejudice resulting to either Ms. Blunt or Mr. Hall. In either case, that standard can't be met here. There was an abundance of evidence that clearly demonstrated Mr. Hall's guilt. Forget Renita Blunt. Forget Renita Blunt ever testified in this case. Take her testimony out of the record, and Mr. Hall's guilt on these counts is shown by Edgar Leon's voice identification on five different claimants. I'm sorry, four different claimant names. And more importantly, the financial evidence. Follow the money. The benefits that were paid on these claims wound up in Mr. Hall's bank account. And that's the bottom line. There was no real prejudice here. All right. Thank you. Thank you again. Thank you for your attention. And we'll hear from Ms. Wilson and Roboto. Thank you again, Your Honors. The place in the record where you will find the proffer that we've been referring to is in the joint appendix filed actually by Mr. Hall in Volume 2 at page 59, paragraph 5. I think that's the most succinct statement. Page 59? Page 59 of Mr. Hall's Volume 2 joint appendix. There are a few points I wanted to address that Mr. Daniel raised. There was a question, actually, was there a curative instruction from the court on the issue of duress? And there was not. No, that was unsaid. Well, it wasn't curative. I was confused in thinking about the instruction that is applicable to severance here and keeping separate. So I apologize for that. I did want to, because the court had raised the question of instructions from the court, I think what I'd like to leave the court with on the issue of duress is what the instruction to the jury would have been. And it would have been very important in this case. There was only one act by Ms. Blunt that was testified to at the trial. She claimed she committed that act under duress. What the jury would have been told had Judge Rambo given the instruction is that she bore the burden of proof on that defense by a preponderance of the evidence, not beyond reasonable doubt. That explanation was not given to the jury, and it would have been a complete defense. In other words, the jury could have concluded that she committed that act but was nonetheless not guilty. That instruction was not given. That's an important point, and that's from the model circuit instruction. So that the instruction would have been that is not in dispute in this case. Just briefly on severance, Mr. Daniels presenting to the court that there's a huge difference between the right to testify and the privilege against incrimination against a spouse, and that there is somehow this choice that can only be resolved by having the client either testify or not. But there was another option available to Judge Rambo, which was hold separate trials. There were only two defendants in this case. Yes, there's a cost. Yes, there's an inefficiency. But that would have been the perfect solution to resolve this dilemma on behalf of my client. I see that my time is up. I'm, of course, happy to answer questions. How many trial days would it have taken to trial your client alone? That's difficult to say. It was a five-day trial inclusive of jury selection and deliberation. I think the government may be in a better position to answer that question. So thank you, Your Honors. Thank you very much. Thank you very much, counsel. We'll take the matter under advisement. We thank you for your helpful argument.